Filed 7/15/14  In re Audrey H. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re AUDREY H., a Person Coming Under the Juvenile Court Law. | B253163 (Los Angeles County Super. Ct. No. CK79875) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CYNTHIA M. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jacqueline Lewis, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant Cynthia M.

Eva Chick, under appointment by the Court of Appeal, for Defendant and Appellant R.H.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Kim Nemoy, Deputy County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

This case began as a dependency matter in Riverside County Juvenile Court. It was processed by the Riverside County authorities and later transferred to Los Angeles County. R.H., the father, and Cynthia M., the mother, appeal from the Los Angeles County Juvenile Court's order terminating parental rights as to the child, Audrey H. The parents contend the Department of Children and Family Services (the department) failed to demonstrate the child was adoptable under Welfare and Institutions Code section 366.26.[1] The father also argues the parental relationship exception to adoption applied. The parents finally contend inadequate notice was provided as required under the Indian Child Welfare Act. We affirm the orders under review.

# II. BACKGROUND

## A. Procedural Background

On October 26, 2009, the Riverside County Department of Public Social Services-Child Protective Services filed a dependency petition with the juvenile court in that county concerning the child. The petition alleges the child was at a substantial risk of serious physical harm under section 300, subdivision (b). The petition alleges: Cynthia M. abused alcohol and was found intoxicated by Inglewood law enforcement personnel at a train station; Cynthia M. left the child, who was one-year old at the time, alone in a hotel room; Cynthia M. knew or should have known R.H. had a cognitive deficiency and could not provide regular care for the child; the parents kept their home unsanitary and allowed individuals with criminal arrests to reside in their residence with access to the child; R.H. allegedly knew or should have reasonably known Cynthia M.

---

[1] Further statutory references are to the Welfare and Institutions Code.

was abusing a controlled substance while supervising the child and failed to intervene; and R.H. also allegedly abused marijuana which placed the child at risk of harm.

On October 27, 2009, at the detention hearing, the Riverside County Juvenile Court found probable cause to detain the child. The child was temporarily placed with the Riverside County Child Protective Services agency. The Riverside County agency was ordered to investigate possible Indian Child Welfare Act issues.

On November 24, 2009, the Riverside County authorities filed a first amended petition. The Riverside County authorities added the allegation that Cynthia M. and R.H. engaged in domestic violence. The last incident allegedly occurred on November 2, 2009, and resulted in R.H.'s arrest.

A jurisdiction hearing was held on December 2, 2009. The Riverside County Juvenile Court found the child was a minor within the meaning of section 300, subdivision (b) and continued custody was necessary. Reunification services were ordered provided to both parents. The Riverside County Juvenile Court found proper notice was provided under the Indian Child Welfare Act. The Riverside County Juvenile Court struck the allegations concerning: R.H.'s cognitive deficiency; individuals with criminal arrests having access to the child; and R.H.'s marijuana abuse.

A status review hearing was held on June 2, 2010. The Riverside County Juvenile Court ruled: the Indian Child Welfare Act did not apply to the child; continued jurisdiction and placement in a relative's care was necessary; and the parents' progress with the reunification plans was unsatisfactory. However, the Riverside County Juvenile Court found a substantial probability that the child would be returned to the parents, and thus ordered reunification services to continue.

On July 30, 2010, the Los Angeles County Juvenile Court accepted jurisdiction.[2] On December 1, 2010, another status review hearing was held. The court again found continued jurisdiction necessary. The court found the parents' progress to alleviate the

---

[2] Further references to the juvenile court are to Los Angeles proceedings, unless otherwise noted.

causes necessitating foster care was only partial. During a status review hearing on April 26, 2011, the juvenile court continued the matter to June 20, 2011.

On June 21, 2011, the juvenile court held a permanent plan hearing. The juvenile court concluded there was not a substantial probability the child would be returned to her parents' custody. The juvenile court terminated family reunification services and set the matter for a section 366.26 hearing on October 18, 2011. The section 366.26 hearing was continued from October 18, 2011 to January 24, 2012. On January 24, a permanent plan hearing was set for February 24, 2012, pending a home study. During the February 24, 2012 hearing, the juvenile court found the parents' progress to alleviate the causes necessitating foster care was minimal. On June 22, 2012, the juvenile court again continued the section 366.26 hearing pending completion of a home study.

On August 21, 2012, the juvenile court ordered the child detained in shelter care. On September 21, 2012, the juvenile court granted Cynthia M.'s section 388 motion and awarded her six more months of reunification services. On October 19, 2012, the juvenile court held a progress hearing and continued the matter to March 22, 2013 for a contested permanency plan review hearing. On March 22, 2013, the juvenile court continued the matter to April 24, 2013. On April 24 and 30 2013, permanency planning hearings were held. On May 7, 2013, the juvenile court terminated reunification services for the mother and set the matter for a section 366.26 hearing.

On September 4, 2013, R.H. was found to be the presumed father. On October 30, 2013, the juvenile court held the section 366.26 hearing. The juvenile court terminated the parents' parental rights. The juvenile court found the child was adoptable and selected the permanent plan of adoption. Both parents subsequently appealed.

## B. Factual Background

### 1. October 27, 2009 Riverside County detention report

Riverside County Department of Public Social Services Social Worker Denise Moore wrote that on October 20, 2009, Inglewood police generated a referral regarding general neglect and caretaker absence. The police responded to a call indicating Cynthia M. was drunk, raped and dressed only in a T-shirt and panties near a Metro station. Cynthia M. was driven to Centinela Hospital by sheriffs. Cynthia M. denied she was sexually assaulted. However, the mother stated the child had been left at a hotel room. Inglewood police attempted to find the child. But Cynthia M. and a friend would not provide the correct information as to the child's whereabouts. A review of surveillance videotape indicated another woman had taken the child from the hotel. The police later learned the paternal grandmother had taken the child to her house. R.H. later came and picked up the child at the grandmother's house. Cynthia M. was arrested for child abandonment. The mother had an extensive criminal history as a juvenile, including battery and burglary charges.

The father initially agreed to bring the child to the police station so she could be seen. The police determined the father had a criminal history as a minor. This included charges for battery, deadly weapon, false imprisonment, sodomy, sex with a minor, criminal threats, and rape. The father later informed the officers he would not bring the child to the station because he was tired.

On October 22, 2009, Ms. Moore was informed by the Corona police that several members of the parents' household were on probation. Ms. Moore went to the home accompanied by the police. R.H. was present and informed Ms. Moore the child was with the paternal grandmother. Ms. Moore walked through the house which was in a deplorable condition. Clothes and trash was scattered throughout the heavily stained floors and old food was in the kitchen area. R.H. agreed to have his mother bring the child by the house.

5

Ms. Moore returned to the house that day. R.H. stated Cynthia M. had a drinking problem. He stated Cynthia M. will drink until she passes out. He denied domestic violence had occurred. R.H. minimized his prior sexual assault record claiming it was caused by an angry ex-girlfriend from a few years ago. He agreed to a drug test before law enforcement which came back positive for marijuana. He contested the results. The paternal grandmother informed the social worker that R.H. was developmentally delayed and had dyslexia and poor anger management skills.

On October 22, 2009, Ms. Moore spoke with Cynthia M. The mother admitted to drinking vodka that night but believed someone may have drugged her. The mother denied using any drugs since the child was born. The mother: admitted to having an alcohol problem and would seek treatment; admitted to her criminal history as a juvenile; denied any domestic violence occurred between her and R.H; and stated she does not work and goes back and forth between Corona and Los Angeles. Cynthia M. is the child's biological mother. Both Cynthia M. and R.H. state he is the child's biological father.

## 2. November 25, 2009 jurisdiction report

The jurisdiction report was prepared by another Riverside County social worker, Cynthia Richardson. Cynthia M. denied having Native American ancestry or tribal affiliation in her family. R.H. stated he did have Native American ancestry with a possible Blackfoot tribal connection. The Indian Child Welfare Act noticing clerk mailed notices with return receipt requested to the Blackfeet Tribe, the interior department, and the parents.

Ms. Richardson noted a prior alleged criminal incident occurred at the home where the child lived with R.H. On August 30, 2009, an unidentified family member in the home allegedly kidnapped his girlfriend. Also, their mutual child was kidnapped. The unidentified family member drove them to the home. According to Ms. Richardson: "In front of [the child], her father, her mother and the paternal grandparents, the paternal

6

relative threatened to kill his child and held a knife to the mother's neck and threatened to kill her also. The relative fled before law enforcement arrived . . . ."

On November 3, 2009, Ms. Richardson initially contacted Cynthia M. Cynthia M. stated R.H. had lured her to his home the day before. R.H. promised a visit with the child. He dragged her into the home and threatened her. Cynthia M. stated a friend called the police. According to Cynthia M., she was only able to leave after they arrived. On November 5, 2009, Cynthia M. left a message with Ms. Richardson. Cynthia M. said she could not meet because R.H. had verbally threatened her.

On November 10, 2009, R.H. was interviewed. He had known Cynthia M. for seven years and they have problems in their relationship. He did not consider their relationship had domestic violence but admitted there was a little yelling. R.H. admitted he was arrested for juvenile battery of his ex-girlfriend. R.H. denied using controlled substances ever since he started training as a boxer two years prior. R.H. explained that Cynthia M. would drink every day to get drunk. He did not believe Cynthia M. drank during her pregnancy. R.H. denied being cognitively deficient. He stated he had special glasses for his dyslexia and had taken special education classes because of his behavior. He stated he had graduated from high school and Cynthia M. had distorted his issues.

R.H. denied his home was dirty as was reported. He stated it was cleaned three or four times a week. R.H. stated the report of persons with criminal records residing in the house concerned a brother. R.H. asserted the brother had moved to Los Angeles. R.H. stated he did not use marijuana, but was around it at his gym.

Ms. Richardson also interviewed E.H., R.H.'s mother. E.H. stated she had taken Cynthia M. to the train station in the afternoon. E.H. denied R.H. had a cognitive deficiency and was unable to care for the child. She did not consider the home to be unsanitary. E.H. stated R.H. lived with the paternal grandfather and a brother. E.H. believed R.H. did not know how bad Cynthia M.'s drinking problem was. She denied R.H. used marijuana.

On November 19, 2009, Ms. Richardson spoke with the foster mother whose identity remained confidential. The foster mother said the child was eager to interact

7

with R.H. R.H. was described as a "hands on" father and appeared to know the child's likes and dislikes. Cynthia M. was described as distracted when interacting with the child. Cynthia M. was looking at the clock and did not appear fully engaged with the child. The child was often reluctant or hesitant to go to Cynthia M. During the last visit, the foster mother reported that Cynthia M. arrived unkempt and struggled to keep up with the child's activity. Cynthia M.'s friends came to the office window to signal her. The foster mother described them as Cynthia M.'s "'party kind of friends.'"

The paternal grandmother, E.H., expressed interest in caring for the child. She has a prior child social welfare and criminal history. Cynthia M.'s mother had numerous referrals and her case history would not qualify her for placement. J.H., E.H.'s father, would not be appropriate for placement because of numerous police contacts and criminal history of family members. Cynthia M. was referred by Ms. Richardson to parenting and anger management classes, individual counseling, random narcotic testing and a drug treatment program. Also, R.H. was referred to parenting and anger management classes, individual counseling, and random drug testing.


### 3. May 20, 2010 status review report


A Riverside County social worker, Anita Castro, reported the child had been placed with E.H. on April 20, 2010. On November 20, 2009, the social worker received a letter from the Blackfeet Tribe in Montana. The Blackfeet Tribe family advocate indicated that after researching the tribal enrollment, the child was not an Indian child as defined by the Indian Child Welfare Act. The letter was forwarded to the Indian Child Welfare Act noticing clerk and filed with the Riverside County Juvenile Court.

Ms. Castro's interviewed the mother. Ms. Castro wrote: "[Cynthia M.] reports that she is living in central Los Angeles, with the maternal grandmother, [A.M.]. Also, living in the home are [Cynthia M.'s] siblings, [I.M.] and [J.M.], [half-sibling, P.D.] and the maternal grandmother's significant other, [P.D.]. [Cynthia M.] reports that although her permanent residence is with her mother that she also occasionally stays with her

8

maternal [great-grandmother, C.V.]. [Cynthia M.] is currently unemployed and reports she is being assisted financially by her mother and grandmother, who provide her with housing, food, and bus/train fares." In a separate interview, A.M. confirmed Cynthia M.'s financial situation. The mother blamed her inability to find a job on being in this country in violation of the immigration laws and not having a high school diploma or general equivalency degree. Cynthia M. stated that the child endangerment charges against her had been dropped.

Cynthia M. reported several incidents of domestic abuse committed by R.H. against her. Prior to Cynthia M. becoming pregnant, R.H. became more aggressive and jealous and less tolerant of her tendency to be friendly and "party" with her friends. Cynthia M. stated R.H. would hit her on her face, arms and torso, frequently with closed fists. R.H. would regularly cause Cynthia M. to have black eyes. Cynthia M. indicated she was beaten at least once a week. R.H. once shoved the paternal grandfather to the ground. R.H. then choked the paternal grandfather. R.H.'s family members were aware he frequently hit Cynthia M. and threatened her but they never intervened. Disputes between R.H. and Cynthia M. were centered around the child because Cynthia M. wanted to take the youngster to Los Angeles.

Cynthia M. said she was afraid to call the police. She would make up stories about falling down when asked about her injuries. Cynthia M. said she felt powerless against R.H. She was adamant that she never recanted any domestic violence allegation. R.H. was frequently angered by Cynthia M.'s overly friendly gestures with other males. A.M., Cynthia M.'s mother, spoke about the domestic violence issue. A.M. told Cynthia M. to tell the police about the domestic violence issues and to take the child away.

Ms. Castro met with Cynthia M. on April 22, 2010. Homeboy Industries was the service provider for Cynthia M. Cynthia M.'s mother's home was observed to be neat and clean. The home was located in an inner city neighborhood with blight and deterioration. Cynthia M. was well-known at Homeboy Industries and open to discussing her personal life with others. Concerning Cynthia M.'s participation in services, Ms.

9

Castro contacted Homeboy Industries on April 22, 2010. Cynthia M.'s substance abuse counselor, Juan Carlos Zamudio, confirmed she started attending the substance abuse program and appeared motivated. Regarding parental education and domestic violence, Cynthia M. failed to appear for her initial appointment for December 11, 2009. She appeared for a scheduled intake assessment on December 30, 2009. Ms. Jennifer Escalera, the counselor, noted that Cynthia M. was unmotivated to attend treatment.

R.H. continued to reside with the paternal grandfather, J.H., and younger brother, S.H. R.H.'s sole income source came from being a professional boxer. He denied using controlled substances because he was drug tested frequently as a boxer. R.H. had recently been placed on probation for 36 months because of traffic violations. R.H.'s driver's license was suspended.

On May 13, 2010, two Riverside County social workers arrived unannounced at R.H.'s Corona home. The social workers saw at least eight holes in the walls and bedroom doors caused by kicking or punching. One of R.H.'s relatives claimed the holes were there when they moved in. The home was somewhat messy but otherwise fairly typical of a residence of three men.

R.H. was referred to the Community Access Network for parental education. The instructor sent an April 15, 2010 notice to Ms. Castro. R.H.'s participation level was moderate in that he had some participation in group discussion. R.H. completed most of the homework assignments and attended 11 of 14 classes. On March 6, 2010, R.H. completed the parent education program. R.H. was also referred to the Alternative to Domestic Violence/Coalition for Family Preservation Program. R.H. had not begun participation in his domestic violence program. Ms. Castro contacted the program. The intake specialist indicated R.H. had completed initial enrollment on December 29, 2009. But R.H. failed to attend his first group session.

R.H. submitted to hair follicle testing. The test result was negative for all drug screens. On April 6, 2010, R.H. submitted to an on-demand saliva drug test. He admitted it might return positive for marijuana, which it did. R.H. admitted he smoked

some marijuana several days prior and claimed it was a one-time incident. R.H. agreed to additional random drug testing.

Cynthia M.'s visits with the child occurred at the Community Access Network in Corona. Cynthia M. had difficulty with consistency; she frequently arrived late, cancelled at the last minute and occasionally never showed up. Cynthia M. frequently requested the visits be changed to different days to accommodate her transportation problems. During the visits, Cynthia M. would occasionally be very hyperactive and talk fast. Cynthia M. would often become quite sad. This sadness resulted from Cynthia M. missing the child. The child was generally happy to see Cynthia M. But sometimes the child would have to warm up to Cynthia M. The social worker observed Cynthia M. was generally appropriate and comfortable with the child. Ms. Castro wrote, "[Cynthia M.] was generally appropriate and comfortable in her interaction with [the child], frequently getting physically involved in her play, reading to her and holding her in her arms and kissing her." Ms. Castro made these observations at visits on February 18, March 11 and 25, April 15 and 22 and May 6, 2010. During a March 11, 2010 visit, Cynthia M.'s speech appeared somewhat slurred. After a saliva drug test, Cynthia M. tested positive for marijuana and amphetamines.

Cynthia M. conceded during another visit on March 25, 2010, that she had been irresponsible and inconsistent concerning the social worker's ability to contact her. Cynthia M. stated her marijuana and alcohol abuse was affecting the quality and consistency of her visits with the child. After this discussion, Cynthia M.'s visits improved. Ms. Castro took the child to a park near the Metro-Link train station in Riverside. Cynthia M. actively engaged with the child during these visits.

R.H.'s visits occurred at the Community Access Network office in Corona. R.H. arrived on time and never failed to keep his visits with the child. The visits were appropriate but R.H. seemed easily distracted by text messages on his cell phone. Ms. Castro observed during a visit that R.H. was comfortable in his interaction with the child. He would get a book to read and hold her in his arms. He was somewhat stiff in his interactions and admitted it was difficult to be himself while being watched.

11

The child was placed with E.H., the paternal grandmother. E.H. confirmed R.H.'s visits were every Wednesday. E.H. would go to R.H.'s home and pick him up. R.H. was advised that he was authorized to have liberal visitation with the child as of April 20, 2010. He stated he had not increased his visitation because of transportation problems. R.H. was informed that this was not an excuse and public transportation was available. R.H. indicated he would start to visit more often. Ms. Castro recommended six more months of reunification services be provided for both parents.

### 4. December 1, 2010 status report

As noted, on July 30, 2010, the Los Angeles Juvenile Court accepted jurisdiction of this case. The department social worker Angela Splane, stated the child was very bonded with E.H., the paternal grandmother. Cynthia M. was participating in her court-ordered programs. She randomly drug tested and all results returned negative. According to Ms. Splane, "[Cynthia M.] is back on track at her program toward reunifying with her daughter." R.H. did not provide any information concerning other programs he attended. R.H. partially complied with court orders and appeared to have no interest in family reunification with the child. R.H. did not start his domestic violence class. He maintained he was under the impression he no longer needed to attend because Cynthia M. had recanted her domestic violence allegations. He did not enroll in any domestic violence class as of December 1, 2010.

### 5. April 26, 2011 status report

Cynthia M. had been dismissed from her program in February 2011. Cynthia M. had assaulted a peer. The social worker, Crystal Newsome, did not identify the program. Cynthia M. had not visited the child since February 2011. Cynthia M. failed to appear for a toxicology test on April 4, 2011. Cynthia M. re-enrolled in another treatment program on April 4, 2011. R.H. continued to not attend a domestic violence class or

12

individual counseling.  Ms. Newsome recommended termination of parental rights because of their partial participation in the case plan and length of time the parents had received family reunification services.  Adoption by E.H. was recommended.

### 6.  June 20, 2011 last minute information for court document

Ms. Newsome, the social worker, reported that Cynthia M. was arrested for "Threatening with Intent to Terrorize" on April 26, 2011 and released on May 2, 2011.  Cynthia M. asked for assistance in arranging visitation.  Ms. Newsome wrote that Cynthia M. frequently claimed to not have E.H.'s contact information to arrange for visits.  A visit occurred on June 15, 2011.  Cynthia M. claimed she was late.  Rather than telephone E.H., Cynthia M. called Ms. Newsome.  She continued to attend her drug treatment program but had not submitted to narcotic testing since February 2011.

### 7.  January 6, 2012 last minute information for court document

A new social worker, Annie Harris, indicated E.H.'s home study was put on hold.  E.H. had moved from her home and was residing with a friend.  E.H. was informed she would have to secure permanent housing before they could proceed with adoption.

### 8.  February 24, 2012 status report

Ms. Harris wrote that the child still resided with E.H. who had moved.  The residence where E.H. and the child had previously resided was being sold.  Cynthia M. had not visited the child allegedly because E.H. had moved.  According to Ms. Harris, "[E.H.] states that the inconvenience of having to move has not affected her in [any way] of being able to care for [the child]."  The mother asserted she had enrolled in a drug program.

13

9. July 25, 2012 last minute information for the court document

Another new social worker, Chiquita I. Evan, was unable to proceed with E.H.'s adoption planning because of the home instability. E.H. did not have permanent housing. E.H. reported that the foster parent stipend was her only source of income at the time.

10. July 26, 2012 status report

On July 24, 2012, E.H. stated that she would begin working and would move to her own apartment by August 1, 2012. The child attended daycare five days a week. Cynthia M. stated she was enrolled in a drug treatment program and had just completed a parenting class. Cynthia M. also completed a domestic violence class. Cynthia M. gave birth to another daughter, L.R., in June, 2012. Cynthia M. was supported by P.R., L.R.'s father. Cynthia M. visited the child twice a month.

11. August 21, 2012 detention report

In August 2012, another social worker, Latasha Burns, learned the child was not residing with E.H. On August 14, 2012, Ms. Burns contacted E.H.'s former roommate, who was identified as Ms. Phillips. Ms. Phillips stated the child was "hardly" at home and was staying with a lot of other people. Ms. Phillips stated the child had stayed overnight with Cynthia M. several times and had also stayed with R.H. and his wife. The child had stayed with Ms. Phillips's daughter as well.

On August 15, 2012, the social worker informed E.H. that a visit was needed and asked about the child's whereabouts. E.H. had moved but failed to provide an address. E.H. stated the child would be left with Cynthia M. in Los Angeles.

On August 16, 2012, Ms. Burns went to Cynthia M.'s home and found the child with unknown individuals. Ms. Burns spoke with Cynthia M. Cynthia M. informed her

that E.H. had dropped off the child that morning. The child was placed with new foster parents, K.D. and D.D. The new foster parents were willing to adopt the child.

12. September 11, 2012 last minute information for the court document

Ms. Burns recommended Cynthia M.'s petition for a change to the order terminating reunification services be granted. Ms. Burns found that Cynthia M. had sufficient changed circumstances. Ms. Burns recommended additional reunification services. The modification petition was granted.

13. October 19, 2012 interim review report

Ms. Burns stated the child had a close bond with the new foster parents and enjoyed attending school. Cynthia M. stated she was attending drug program classes daily. Cynthia M. had not been able to submit to random drug testing because she allegedly lacked proper identification. Ms. Burns asked Cynthia M. to come to the office for a photograph to be taken and a letter provided to apparently facilitate drug testing. But Cynthia M. had not come to the office as of October 19, 2012. Cynthia M. visited the child weekly and had appropriate visits. R.H. had no contact with the child and had not completed the court ordered programs.

14. March 22, 2013 status review report

Ms. Burns reported the child liked going to school and playing with friends. The new foster parents stated the child was a joy in the home. Ms. Harris also wrote: "[The new foster parents] stated [the child] expressed that [Cynthia M.] told her that other people wanted her, that she needed to lie and that she was going to be leaving the [new foster parents'] home. [The new foster parents] stated [the child] then began wanting to sleep with them and not wanting to leave their side. [The new foster parents] stated [the

15

child] began asking questions if she had to leave and stating that she did not want to leave." The child confirmed the foster parents' foregoing allegations. In addition, Cynthia M. had visited the child with an unidentified male. Further, according to the new foster parents: "[The child] also said that [Cynthia M.] told her that she will be going to court and that she is going to tell the judge that she is going to get a big house, with a big backyard and a lot of toys for her to play with. She stated if the judge says yes then she can come but the judge says no then she cannot."

The child received a psychological evaluation on January 31, 2013. The assessment found the child would benefit from individual psychotherapy. When she was first placed with the new foster parents, the child had difficulty at school and was prone to hitting when angry or frustrated. However, she had now become pro-social at school with no aggression issues reported. The assessment noted the child would occasionally wet the bed. She would have intense reactions to water. The child began receiving weekly counseling services through Counseling 4 Kids with a therapist, Gene Tyson.

Cynthia M. stated she completed a drug program, parenting class, and domestic violence program. Ms. Burns told Cynthia M. that P.R. and other relatives needed to be live scanned before visiting the child. Ms. Burns also explained it was inappropriate to discuss the case with the child.

During monitored visits, Cynthia M. appeared to have little to no interaction with the child. Cynthia M. began unmonitored visits on November 2, 2012, because she had tested negative for drugs. Cynthia M. missed five visits because she forgot to confirm the appointment. The child was happy to return to the new foster parents after the visit was over.

Ms. Burns wrote that Cynthia M. would be unable to provide a stable home or financial and emotional stability for the child at this time. Her sole financial support came from her "significant other" who was not otherwise identified. Cynthia M. was also currently raising a newborn daughter and was unable to obtain suitable housing. No strong bond between the child and Cynthia M. was observed despite completing

parenting class and having 24 months of reunification services.  Ms. Burns recommended termination of family reunification services for Cynthia M.

### 15.  April 24, 2013 interim review report

Ms. Burns related that on April 8, 2013, the child stated Cynthia M. called. Cynthia M. had the child speak with E.H.  There was a no contact order in place regarding E.H. and the child.  Cynthia M. did not consider the effects of this contact on the child.  R.H. never visited the child despite the social worker arranging for scheduled visits.  The new foster parents have an approved home study.

### 16.  September 4, 2013 section 366.26 report

The child was developmentally normal according to Ms. Tyes.  Ms. Tyson, the therapist, saw the child on a weekly basis.  Ms. Tyson noted the child identified feelings and emotions connected with anxiety.  According to the new foster parents the child displayed heightened attachment issues after visits with Cynthia M.

The new foster mother said Cynthia M.'s visits with the child were inconsistent for the prior several months.  Cynthia M. did not contact the child telephonically. Cynthia M. had not visited the child for three weeks.  Another social worker, Chiquita Evans, found the new foster parents would be able to provide for the child's financial needs.  The child had only resided with Cynthia M. for one year.  The child was now four-years old.  R.H. failed to inquire or be proactive regarding reunification with the child.  The department recommended termination of parental rights and that the child be placed for adoption.

17.  October 8, 2013 last minute information for the court document

R.H. had a one-hour monitored visit with the child on September 18, 2013.  He failed to appear the following two occasions and cancelled a third scheduled visit.  Cynthia M. failed to appear for two scheduled visits.  Cynthia M. appeared for a visit on September 25, 2013.  Cynthia M. agreed to visit every Wednesday but failed to appear for the next visit.  A social worker, Michelle Aguilar, noted the child continued to present anxiety symptoms.  This included:  feeling fearful about her future; excessive crying; nightmares; nail biting; bed wetting; fear of water; and poor social and academic skills.  The child reacted strongly to inconsistent scheduled visits, by excessive crying, tantrums and the inability to self-regulate.

18.  October 30, 2013 section 366.26 hearing

It was stipulated the child knew the father as such and called him "dad" during visits.  Cynthia M. testified to having weekly monitored visits for one hour.  Cynthia M. formerly had unmonitored visits.  During visits, the child would run to Cynthia M. and say "mommy."  Cynthia M. testified the child wanted to be cuddled.  Cynthia M. would play and sing with the child during visits.

III.  DISCUSSION

A.  The Child Was Adoptable

The parents argue the child was not adoptable.  This contention is meritless.  Adoptability focuses on whether the child's age, physical condition and emotional state make it difficult to find a person willing to adopt the minor.  (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; *In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)  Our Supreme Court has stated, "All that is required is clear and convincing evidence of the likelihood

that adoption will be realized within a reasonable time." (*In re Zeth S., supra,* 31 Cal.4th at p. 406; accord *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.)  Section 366.26, subdivision (c)(1) stresses, "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." If a child is generally adoptable, we do not assess the suitability of the prospective adoptive home.  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.)  A prospective adoptive parent's interest in adopting the child is evidence that the minor's age, physical condition or mental state will not discourage others from adopting the youngster.  (*In re I.W., supra,* 180 Cal.App.4th at p. 1526; *In re Erik P.* (2002) 104 Cal.App.4th 395, 400.)  We review an adoptability finding for substantial evidence.  (*In re Michael G., supra,* 203 Cal.App.4th at p. 589; *In re Jose C.* (2010) 188 Cal.App.4th 147, 158.)

R.H. contends the evidence was not sufficient to support a finding that the child was adoptable.  R.H. argues the child's listed symptoms reflected a youngster with emotional and behavioral problems who may have special needs.  R.H. asserts the child may not be ready for adoption based on emotional instability.  Cynthia M. joins in R.H.'s argument.

Substantial evidence supports the juvenile court's finding that the child was adoptable.  To begin with, no medical or psychological professional stated the youngster is a special needs child.  The child was found to have at least two families who wanted to adopt her.  The child had a stable placement with her new foster parents and was anxious about leaving them.  The child received therapy for her issues.  Additionally, the new foster parents remained interested in adopting the child despite her issues.  The juvenile court did not err by finding the child was adoptable.

## B.  R.H. Did Not Qualify For The Parental Relationship Exception

R.H. argues he qualified under the parental relationship exception to the preference for adoption.  This contention is frivolous.  Section 366.26, subdivision (c)(1)(B) states, "[T]he court shall terminate parental rights unless . . . [t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to the existence of specified exceptional circumstances.  (See *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)  One such exception is, "The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i); see *In re Marcelo B., supra*, 209 Cal.App.4th at pp. 642-643.)  The burden to produce evidence is on the party seeking to establish the existence of the statutory exception.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314; *In re Megan S.* (2002) 104 Cal.App.4th 247, 252.)  We review the juvenile court's findings concerning exceptions to adoption for substantial evidence.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; compare *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard].)

R.H. contends that he entered into evidence a stipulation at the October 30, 2013 section 366.26 hearing.  The stipulation was that the child recognized R.H. as her father.  This stipulation fails to demonstrate that R.H. qualified for the beneficial parent relationship.  The evidence showed that prior to the child being removed from E.H.'s custody, R.H. never progressed passed monitored visits.  After the child was placed with the new foster parents, R.H. visited his child once.  To establish the parental relationship exception:  "[T]he parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.]  Rather, the parents must show that they occupy a 'parental role' in the child's life. [Citation.]"  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

Substantial evidence supports the juvenile court's finding that no exception to adoption applied.  R.H. did not demonstrate he had a parental role in the child's life.

R.H. never progressed beyond monitored visitation which can be used as a factor against finding the parental exception was met.  (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re Andrea R.*, *supra*, 75 Cal.App.4th at p. 1109.)  After his child was removed from his mother's custody, R.H. ceased almost all contact with the child.  The juvenile court did not err by finding the beneficial parental relationship exception to adoption did not apply to the child.

## C.  The Indian Child Welfare Act Notice Was Proper

Our Supreme Court has held:  "[The Indian Child Welfare Act] is a federal law giving Indian tribes concurrent jurisdiction over state court child custody proceedings that involve Indian children living off of a reservation.  [Citations.]  Congress enacted [the Indian Child Welfare Act] to further the federal policy '"that, where possible, an Indian child should remain in the Indian community . . . ."'  [Citation.]"  (*In re W.B.* (2012) 55 Cal.4th 30, 48 [fn. omitted.]; *In re D.N.* (2013) 218 Cal.App.4th 1246, 1250-1251.)  Our Supreme Court has explained:  "[I]f the court knows or has reason to know that an '"Indian child"' is involved in a '"child custody proceeding,"' as those terms are defined in the Act [citation], the social services agency must send notice to the child's parent, Indian custodian, and tribe by registered mail, with return receipt requested.  [Citation.]"  (*In re W.B., supra*, 55 Cal.4th at p. 48; *In re D.N.*, *supra*, 218 Cal.App.4th at p. 1251; see § 224.2, subds.(a)(3) & (a)(4) [state law provision].)

Notice by the department should follow a two-step procedure.  "'First, it should identify any possible tribal affiliations and send proper notice to those entities, return receipt requested.  [Citation.]  Second, [the social services agency] should provide to the juvenile court a copy of the notice sent and the return receipt, as well as any correspondence received from the Indian entity relevant to the minor's status.'"  (*In re I.W., supra,* 180 Cal.App.4th at p. 1529, quoting *In re Marinna J.* (2001) 90 Cal.App.4th 731, 739, fn. 4.)  The Fifth Appellate District has held:  "[I]f the identity or location of the tribe cannot be determined, the notice shall be given to the Secretary of the Interior

21

(Secretary). (25 U.S.C. § 1912(a).) The burden of identifying and providing notice to the proper tribe then shifts to the Secretary who presumably has more resources and skill with which to ferret out the necessary information." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469; *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1422.) We review the juvenile court's finding whether proper notice was given under the Indian Child Welfare Act for substantial evidence. (*In re D.N.*, *supra*, 218 Cal.App.4th at p. 1251; *In re Christian P.* (2012) 208 Cal.App.4th 437, 451.)

R.H. argues notice was insufficient under the Indian Child Welfare Act. R.H. contends there is a tribe designated as "Blackfeet" which responded on November 16, 2010. However, R.H. claims he is "Blackfoot" and requires notification under both "Blackfeet" and "Blackfoot" tribes. R.H. contends the Riverside authorities were required to send notice to the Secretary of the Interior in Sacramento due to a potential issue regarding the identity of the tribe. R.H. suggests that he may not actually be descended from the Native-American tribe known as "Blackfeet." He contends "Blackfoot" has been associated with the Sioux or Apache tribes. Cynthia M. joins in his argument.

This contention has no merit. The tribe determines tribal membership. (§ 224.3, subd. (e)(1); *In re Edward H.* (2002) 100 Cal.App.4th 1, 4.) The Blackfeet Tribe undisputedly found the child was not subject to the Indian Child Welfare Act. Notice was sent by the Riverside County Child Protective Services' staff to the Blackfeet Tribe and the Secretary of the Interior. There is no "Blackfoot" Tribe in the federal register. He points to no authority that requires the department to do further research or provide further notice. R.H. raised for the first time on appeal the possibility that his "Blackfoot" heritage claim might refer to other Native-American tribes. He never notified the Riverside or Los Angeles child protection agencies or juvenile court of this during dependency proceedings. There was no duty to provide notice concerning possible Native-American heritage to these other tribes.

The department concedes return receipts were not provided to the juvenile court. However, it is undisputed the Blackfeet Tribe received notice because they sent a response. Notice was proper under the Indian Child Welfare Act.

## IV.  DISPOSITION

The orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

---

[*]  Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.